IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| THOMAS J. SICALIDES<br>T&T TRANSPORTATION<br>MICHAELS, INC.<br>MILLENNIUM, INC.<br><br>vs.<br><br>HARTFORD CASUALTY INSURANCE COMPANY | :<br>:<br>:<br>:  CIVIL ACTION NO.<br>:  02-CV-2937<br>:<br>:<br>:<br>: |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT,
HARTFORD CASUALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Pending before this Honorable Court is the motion for summary judgment of defendant, Hartford Casualty Insurance Company ("Hartford"). As is detailed in Hartford's motion, plaintiffs' breach of contract claim should be dismissed since it was filed beyond the two year period permitted by the insurance policy, and plaintiffs' bad faith claim is barred by the two year statute of limitations and collateral estoppel. On November 4, 2002, plaintiffs filed a response to defendant's motion, in which they erroneously argue that (1) the contractual two year limitation of suit provision did not "accrue" for plaintiff Thomas Sicalides' claim until less than two years before suit was filed; (2) the contractual two year limitation of suit provision was tolled because Hartford allegedly requested information regarding plaintiffs' business income loss claims; (3) bad faith actions are governed by the six year statute of limitations; and (4) collateral estoppel should not apply to the bad faith claim because of "newly discovered" evidence. For the reasons discussed herein, none of these arguments are supported by the law or facts, and Hartford remains entitled to summary judgment.

### A. The Two Year Limitation Of Suit Provision In The Insurance Policy Began To Run On The Date Of The Alleged Vandalism (April 2, 1999), Not When Thomas Sicalides Allegedly Did Not Receive His Full Salary

Plaintiffs do not dispute that (1) the insurance policy requires suit to be filed "within 2 years after the date on which the direct physical loss or damage occurred"; (2) the direct physical loss or damage from the alleged vandalism incident occurred on April 2, 1999; and (3) plaintiffs filed this action more than two years after that date. In its opposition to Hartford's motion, plaintiffs argue that the limitation period does not begin to run until the insured suffers the injurious effects of the occurrence, and that "plaintiff Sicalides did not begin to suffer the effects of Hartford's failure to pay until the year 2000." (Plaintiffs' memorandum of law in opposition to defendant Hartford Casualty Insurance Company's motion for summary judgment ("Plaintiffs' opposition memorandum of law") at 2-3). Plaintiffs' argument is both legally and factually wrong.

As a matter of law, the two year limitation of suit provision in the Hartford insurance policy began to run on April 2, 1999, which was the date that the physical loss of or damage to property first manifested itself. (See memorandum of law in support of defendant, Hartford Casualty Insurance Company's motion for summary judgment at 5-7). On that date, all of the physical loss of or damage to property occurred. (Plaintiffs' complaint, ¶23). Furthermore, this trigger of the limitation of suit provision applies even if the alleged damages "would continually worsen." D'Auria v. Zurich Insurance Company, 352 Pa. Super. 231, 507 A.2d 857, 862 (1986); Appalachian Insurance Company v. Liberty Mutual Insurance Company, 676 F.2d 56, 62-63 (3d Cir. 1982). Thus, it is irrelevant whether plaintiffs later discovered that they had additional losses resulting from the alleged vandalism incident.

This interpretation of the insurance policy is not only based upon the unambiguous language in the policy, but it is also logical. Under the terms of the insurance policy, all of plaintiffs'

claims were triggered by the alleged vandalism incident on April 2, 1999. For example, coverage under the Commercial Property Building and Personal Property Coverage Form is limited to "direct physical loss of or damage to Covered Property...." (Commercial Property Building and Personal Property Coverage Form, CP 00 10 06 95, Section "A. COVERAGE", p. 1 of 11, attached as **Exhibit A**).[1]

Similarly, the Commercial Property Business Income (And Extra Expense) Coverage Form limits coverage to a suspension of operations caused by "direct physical loss of or damage to property...." (Commercial Property Business Income (And Extra Expense) Coverage Form, CP 00 30 06 95, Section "A. COVERAGE", p. 1 of 8, attached as **Exhibit B**).[2] Thus, the two year limitation of suit provision unambiguously and logically runs from the "date on which the direct physical loss or damage occurred." (Commercial Property Conditions, Section "D. LEGAL ACTION AGAINST US", p. 1 of 2, attached hereto as **Exhibit C**). In this case, that date was April 2, 1999.

---

[1] The referenced coverage form more fully states:

**A. COVERAGE**
We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

[2] The referenced coverage form more fully states:

**A. COVERAGE**
                              ***
We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property, including personal property in the open (or in a vehicle) within 100 feet, at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

Plaintiffs erroneously argue that the running of the two year limitation of suit provision should not be triggered when the physical loss of or damage to property first manifested itself, but when Thomas Sicalides did not receive his salary due to the physical loss of or damage to property. Plaintiffs' reliance upon Caln Village Associates, L.P. v. The Home Indemnity Company, 75 F.Supp. 2d 404 (E.D. Pa. 1999) is misplaced. In that case, the court analyzed the same limitation of suit provision in the context of a latent and progressive loss, i.e., damage to a building caused by the expansion of uncured slag beneath the slab foundation. The court concluded that "the time or date the direct physical loss or damage occurs for purposes of the suit limitation clauses at issue here is ascertained by determining when the injurious affects *first* manifest themselves in a way that would put a reasonable person on notice of injury." Id. at 411 (emphasis added). "[i]t is not necessary to wait for the ultimate injury to become a certain proposition before the existence o the injury could be ascertained by reasonable diligence." Id. at 412. Moreover, due to its unambiguous language, the "discovery rule" applied to statutes of limitation cannot be applied to the contractual limitation of suit provision. Id. at 413 n. 11.

Therefore, under Caln Village Associates, the two year limitation of suit provision began to run on the date that the "physical loss or damage to property" *first* manifested itself in a way that could be ascertained with reasonable diligence, regardless of whether the damages continued to worsen thereafter. Unlike Caln Village Associates, here it is undisputed that the physical loss or damage to property was a definitely established event - - the alleged vandalism on April 2, 1999.

Plaintiffs' argument is also factually wrong. Even assuming arguendo that the limitation of suit provision did not begin to run until Thomas Sicalides was not paid a salary due to the physical loss or damage to property that occurred on April 2, 1999, the uncontroverted record shows that Thomas Sicalides has claimed to have personally suffered damages that occurred more than two years prior to his filing this suit. For example, plaintiff Sicalides seeks to recover in this action

$390,247.40 alleged damage to business personal property and valuable papers that occurred on *April 2, 1999*, even though those same damages were sought by TJS in the state court action but involuntarily dismissed by the court. (See plaintiffs' document entitled "Shared Property Resources – Unadjusted property for all named insured", attached as **Exhibit D**).

In addition, in response to Hartford's written discovery requests in this action, plaintiff Sicalides has produced n discovery an itemization of alleged damages he personally sustained due to Hartford's alleged breach of the insurance contract. (See document entitled "Thomas J. Sicalides vs. Hartford - - (A) Money Tom Sicalides had to borrow to survive", attached hereto as **Exhibit E**). Plaintiff's document states:

> **Thomas J. Sicalides vs Hartford**
>
> A)   Money Tom Sicalides had to borrow to survive.
>
> | Date of Deposit | Company | Reason | Amount | Exhibit |
> |---|---|---|---|---|
> | 7/22/99 | Mass Mutual ck. | Borrowed on Life Insurance | 7925.00 | A-1 |
> | 7/26/99 | Mass Mutual ck. | Borrowed on Life Insurance | 7450.00 | A-2 |
> | 8/2/99 | Mass Mutual ck. | Borrowed on Life Insurance | 9625.00 | A-3 |

Plaintiff Sicalides' document demonstrates that he claims to have personally sustained damages due to Hartford's alleged conduct as early as July and August 1999, when he claims to have been required to borrow money from his life insurance in order to "survive."

In his deposition, plaintiff Sicalides also testified that he personally sustained damages in July and August of 1999 due to Hartford's alleged conduct. In particular, plaintiff Sicalides testified as follows:

> Q.   Now, Exhibit 5 identifies a topic that says: Records from Prime Bank regular account, do you see that?
> A.   Yes.
> Q.   And there is a check there in the amount of $7,450 for Mass Mutual, insurance loan dated July 26, 1999, is that correct?
> A.   That is what it says.
> Q.   How does that identify a loss suffered by you to the April 1999 incident?
> A.   I had to borrow money. I had to borrow money.
> Q.   And what was the purpose for borrowing the money?

A.     I'm not sure, but I had to borrow money. TJS couldn't pay me the loan back that it owed me.
Q.     You don't recall why you borrowed that money?
A.     I don't know, but I had to borrow the money because I couldn't get my loan money back from TJS.
Q.     And why couldn't you get your loan money back from TJS?
A.     Because Hartford stopped adjusting the claim.
Q.     And when did they stop adjusting the claim?
A.     In June of '99.
Q.     So as of June of 1999, it was your belief that Hartford stopped adjusting all claims?
A.     The last check we got from Hartford my recollection was June 17th of '99 and no further checks were received from Hartford until over a year later, when other property was adjusted.
Q.     Now, going back to June of 1999, you said that Hartford stopped adjusting claims, what do you mean by that?
A.     Stopped paying money. They stopped paying money for the property. They stopped giving us advances for the continuing expenses and they made no advances to any of the other named insured.
Q.     Now, you testified that you borrowed the money in July of 1999 from the Mass Mutual insurance loan because TJS was not paying the loan. What loan are you making reference to?
A.     Well, if you look at the financial report for TJS for the year ending 1998, you will clearly see a loan to officers on their of, I think, $133,000.
Q.     And how is that being paid out?
A.     You know, from time to time, I would - - when the company had money it would pay me.
Q.     Did you receive any payment in January of 1999?
A.     I don't believe so.
Q.     How about February of 1999?
A.     I didn't ask for it. I didn't need it.
Q.     How about March of 1999?
A.     I didn't need it.
Q.     How about April of 1999?
A.     I don't think that I needed it.
Q.     So you didn't get a payment?
A.     I don't believe that I got any payments.
Q.     How about May or June of 1999?
A.     You know, I am guessing. I don't know.
Q.     What was it that happened in July that made you need a payment under that loan from TJS?
A.     I'm not sure. I'm not sure. I may have had taxes due. I may have had - - there was some personal expenses that had to be paid and I didn't really have the money to pay it because all of my money was tied up with TJS.
Q.     Now, on Exhibit 5, you also have an entry lower down on July 22, 1999 from Mass Mutual insurance loan $7,925, is that correct?
A.     Right.

> Q. What was that loan for?
> A. Again, to pay my expenses, my living expenses, whatever was due at that time.
> Q. And, again, you attribute that because Hartford stopped paying the claim to use your words?
> A. No - - well, yes, because TJS was not able to pay me back the money that I had loaned it. Normally, if I had needed money, I would have simply just went to TJS and said write me a check for 20 grand or 15 grand or whatever I needed. I couldn't do that based on the situation we were in.
> Q. Now, you also have an entry of August 2, 1999 for Mass Mutual insurance loan, amount of $9,625, is that correct?
> A. Yes.
> Q. And was that also money that you borrowed because you claim that TJS couldn't make payment to you because their claim wasn't being paid?
> A. That is correct.
> Q. Now, is that also true with respect to all of the loans identified on Exhibit 5?
> A. Yes.

(Thomas Sicalides' deposition at p. 112, l. 19 through p. 117, l. 3, attached hereto as **Exhibit F**).

Therefore, plaintiff Sicalides' statement in his memorandum of law that he "did not begin to suffer the effects of Hartford's failure to pay until the year 2000" is contradicted by his own sworn testimony. In order to avoid the consequences of his failure to timely file this action, plaintiff Sicalides either misstates or ignores his own sworn testimony that clearly triggers the two year limitation of suit provision more than two years prior to the filing of this action. Accordingly, Hartford is entitled to summary judgment.

### B. The Two Year Limitation Of Suit Provision Was Not Tolled By Hartford's Conduct

Plaintiffs do not dispute that the two year limitation of suit provision applied to the breach of contract claims of the corporate plaintiffs. Instead, plaintiffs erroneously argue that their "breach of contract claims is not time barred because Hartford's conduct in adjusting the claim tolled the limitations." (Plaintiffs' opposition memorandum of law at 5). Once again, plaintiffs support their argument through a misstatement of the law and facts.

In support of their argument, plaintiffs rely exclusively upon the decision in <u>Bowersox Truck Sales & Service, Inc. v. Harco National Insurance Company</u>, 209 F.3d 273 (3d Cir. 2000). However, that decision is inapposite. There, the insured's building partially collapsed from the weight of ice and snow on the roof. The insurance policy required that suit be filed "within two years after the date on which the direct physical loss or damage occurred." <u>Id</u>. at 274. Within two years of the collapse, the insurer settled the insured's claim for damage to the building, but the insured's claim for business interruption coverage remained unsettled. <u>Id</u>. at 275-277. Instead, the insurer had ongoing discussions with the insured regarding "possible settlement" of the business income loss claim before and after the two year anniversary of the loss. <u>Id</u>. at 276-277. The insurer also told the insured that "it (Harco) would address the business interruption claim upon the termination of the reconstruction", and the insurer knew that it would probably take more than two years to reconstruct the building. <u>Id</u>. at 275-276.

Based upon these "course of dealings of the parties,", the court held that the two year limitation of suit provision could not be applied to the insured's business interruption claim. <u>Id</u>. at 278-279. The court stated:

> Here, the "totality of the insurance transaction" includes the several requests that Harco made for additional documentation of BTS's business income coverage during and after the purported two year limitation period. Given Harco's conduct, BTS could not have reasonable expected that the two-year clock was ticking. We will not now interpret this contract in any way as to negate the entire course of dealing between Harco and BTS after March 1994. That course of dealing reflects the parties' own interpretation of this insurance policy, and is very relevant to our analysis.

<u>Id</u>. at 278-279. The court also found that the Harco insurance policy limited the limitation of suit provision to the commercial property coverage "part", and that the "Business Income Coverage Form (And Extra Expense)" was a different "part" of the policy. <u>Id</u>. at 278.

Thus, contrary to plaintiffs' assertion, the court in <u>Bowersox</u> did <u>not</u> find that the insurer's conduct "tolled" the limitation's provision. Instead, the court found that the insurer's course of

conduct and the particular language of its policy demonstrated that the insurer did not intend for the limitation provision to apply to the insured's business interruption claim.

Unlike Bowersox, the Hartford insurance policy expressly states that the two year limitation of suit provision applies to the Commercial Property Coverage Part, and the Commercial Property Building and Personal Property Coverage Form and Commercial Property Business Income (And Extra Expense) Coverage Form are part of that coverage part. In particular, the Commercial Property Coverage Part - Declarations states:

> This COMMERCIAL PROPERTY COVERAGE PART consists of:
>
>   A.   This Declarations;
>   B.   Commercial Property Conditions; and
>   C.   Coverage Form(s), Causes of Loss Form(s) and any Endorsements and Schedules listed below.
>
> ***
>
> Except in this Declarations, when we use the word "Declarations" in this Coverage Part, we mean this "Declarations" or the "Common Policy Declarations."
>
> Form Numbers of Coverage Forms, Causes of Loss Forms, Endorsements and Schedules that are a part of this Coverage Part:
>
> HP99011185   CP00900788   HP19051185T   HP99021185   IH10010986
> CP00100695   CP00300695   HP15051295    CP10300695   CP10350695
> CP12180695   HP03011185

(See Form HP 00 10 02 95, attached hereto as **Exhibit G**).

The referenced "Commercial Property Conditions" is form CP 00 90 07 88. This is reflected in the Declarations in both paragraph B as well as the referenced form numbers at the bottom of the Declarations. The Commercial Property Conditions (CP 00 90 07 88) contains the two year limitation of suit provision, and that provision states that "[n]o one may bring a legal action against us under this Coverage Part unless... [t]he action is brought within 2 years after the date on which the direct physical loss or damage occurred." (Commercial Property Conditions, ¶D, p. 1 of 2, attached hereto as **Exhibit C**). Thus, the two year limitation of suit provision clearly and

unambiguously applies to any action brought against Hartford under the Commercial Property Coverage Part.

Moreover, among the endorsements referenced in the Commercial Property Coverage Part - Declarations as forming "a part of this Coverage Part" are forms CP 00 10 06 95 (Commercial Property Building and Personal Property Coverage Form) and form CP 00 30 06 95 (Business Income (And Extra Expense) Coverage Form). (See **Exhibits G**, **A and B**). Thus, the limitation of suit provision applies to all of plaintiffs' claims, whether for damage to property or loss of business income.

In addition, this case is devoid of any factual record that demonstrates that Hartford did not intend the limitation of suit provision to apply to plaintiffs' business income loss claim. Unlike Bowersox, Hartford never suggested to plaintiffs that their business income loss claim could possibly be settled after TJS Brokerage & Company, Inc. ("TJS") filed suit in December 1999. In fact, in May 2000, Hartford filed a counterclaim for insurance fraud in the state court action filed by TJS. (See Hartford's answer and counterclaim in TJS Brokerage & Company, Inc. v. Hartford Casualty Insurance Company, attached hereto as **Exhibit H**). In its counterclaim, Hartford sought repayment of all advance monies paid to TJS as well as attorney fees. As this was nearly a year before the two year limitation period expired, plaintiffs cannot credibly claim that they were lulled into believing that the limitation provision would not be enforced by Hartford.

In support of its "tolling" argument, plaintiffs also attempt to mislead the court by inferring that Hartford made a voluntary claim payment to TJS in the amount of $94,310.72 after filing its counterclaim, and also continued to "adjust" the claim after that time by requesting certain documents during discovery. (Plaintiffs' opposition memorandum of law at 6-7). However, plaintiffs fail to disclose to the court that Hartford made the payment involuntarily in order to comply with an order entered by the state court that partially granted plaintiffs a preliminary injunction while

preserving Hartford's right to defend the state court action on the grounds of insurance fraud. (See letter by Patrick J. Keenan, Esquire to John N. Ellison, Esquire dated August 8, 2000, attached hereto as **Exhibit I**; court order and opinion dated April 24, 2000, attached hereto as **Exhibit J**).

Moreover, the records that Hartford requested after suit was filed in state court in December 1999, where through request for production of documents pursuant to Pa. R. C. P. No. 4009.1. (See, for example, **Exhibit K**). They were obtained to defend the suit filed by TJS. Thus, Hartford never expressly or even implicitly took the position that the limitation of suit provision would not be enforced, and this cannot excuse plaintiffs' failure to comply with that policy provision.

The actual reason plaintiffs failed to file this suit in a timely manner is because their own actions. Plaintiffs have effectively admitted that they deliberately *chose* not to file this suit in a timely manner when they state in their memorandum of law that "once the insurance company alleged fraud in the state court action , it made little sense for the other insured under the same policy to file suit until it was conclusively established that there was no fraud perpetrated by any of the insured upon Hartford." (Plaintiffs' opposition memorandum of law at 7). Accordingly, Hartford is entitled to summary judgment.

### C. The Applicable Statute Of Limitations For A Bad Faith Action Is Two Years, Not Six Years

As addressed in Hartford's motion, bad faith actions under 42 Pa.C.S.A. §8371 are governed by the two year statute of limitations in Pennsylvania. In arguing that a six year statute of limitations should apply to their bad faith action, plaintiffs rely upon Woody v. State Farm Fire and Casualty Company, 965 F. Supp. 691 (E.D. Pa. 1997). However, the decision in Woody does even not reflect the majority view of the federal court decisions on this issue. Most of the federal court decisions have held that the two year statute of limitations applies. See Lochbaum v. United States Fidelity & Guaranty Co., 136 F. Supp. 2d 386, 391 (W.D. Pa. 2000), affirmed 265 F.3d 1055 (3d Cir. 2001), cert. denied 534 U.S. 1066, 122 S. Ct. 667, 151 L. Ed. 2d 581 (2001); Liberty Mutual

Fire Insurance Co. v. Corry Industries, Inc., 2000 U.S. Dist. LEXIS 11735 at *13-14 (W.D. Pa., March 30, 2000); Friel v. Unum Life Insurance Co., 1998 U.S. Dist. LEXIS 18578 at *15-16 (E.D. Pa., November 17, 1998); Nelson v. State Farm Mutual Automobile Insurance Co., 988 F. Supp. 527, 537 (E.D. Pa. 1997). These courts have reasoned that an insurer's duty to act in good faith derives from tort law, and the two year statute of limitations applies to tort actions. See, e.g., Lochbaum, 136 F. Supp. 2d at 390.

As was discussed by the Superior Court in Trujillo v. State Farm Mutual Automobile Insurance Co., 2002 Pa. Super. 280, 2002 Pa. Super. LEXIS 2599 at *13-15 (Pa. Super., September 3, 2002) (attached hereto as **Exhibit L**), the application of the two year statute of limitations for bad faith actions under Section 8371 is further supported by the Pennsylvania Supreme Court's decision in Birth Center v. St. Paul Companies, Inc., 567 Pa. 386, 787 A.2d 376 (2001). In Birth Center, Justices Nigro, Zappala and Castille state in their concurring and dissenting opinions that bad faith claims under Section 8371 sound in tort, not contract, 787 A.2d at 391, while the majority did not address the issue. Since tort actions are governed by the two statute of limitations under 42 Pa.C.S.A. §5524(7), that limitation period also applies to bad faith actions.

### D. Plaintiffs' Bad Faith Action Accrued More Than Two Years Before This Suit Was Filed

Plaintiffs also erroneously argue that the statute of limitations for their bad faith claim did not begin to run until May 20, 2000, which was the date on which Hartford filed an answer to the complaint filed by TJS in state court. Plaintiffs rely exclusively upon Adamski v. Allstate Insurance Company, 738 A.2d 1033 (Pa. Super. 1999). However, plaintiffs misread the Adamski decision.

In Adamski, the court examined the issue of when a claim of bad faith accrues for the purposes of the statute of limitations. 738 A.2d at 1036. The court held that "for purposes of the statute of limitations, a claim accrues when a plaintiff is harmed and not when a precise amount

or extent of damages is determined." Id. at 1042.  In order for the statute of limitations to begin running, the alleged bad faith conduct on the part of the insurer need only be "visible" to the insured. Id. at 1038.  The insured is not required to file suit only when the full extent of its damages are known. Id. at 1041-1042.

In this case, the alleged bad faith conduct on the part of Hartford had to have been visible to plaintiffs at least by December 22, 1999, which was the date TJS filed suit against Hartford in state court for bad faith.  (See **Exhibit C** attached to Hartford's motion for summary judgment, Count IV).  The allegations of bad faith that were plead in December of 1999 by TJS against Hartford mirror the allegations of bad faith plead by the plaintiffs in this action.  (See **Exhibit A** attached to Hartford's motion for summary judgment, Count II).  Moreover, plaintiff Sicalides has testified that by at least December 1999, he believed that Hartford had "stopped adjusting the claim for everybody...."  (See **Exhibit C** attached to Hartford's motion for summary judgment, p. 176-177).

Therefore, by at least December 1999, the alleged bad faith conduct of Hartford was known and visible to plaintiffs.  Since the two year statute of limitations began to run by at least that date, plaintiffs were required to file this suit for bad faith on or before December 22, 2001.  Having failed to file this suit within that time, plaintiffs' claim for bad faith under Section 8371 is time barred.

### E. Plaintiffs' Bad Faith Claim Under Section 8371 Is Barred By The Doctrine Of Collateral Estoppel

In plaintiffs' opposition memorandum of law, they concede that "the issue of bad faith was raised and litigated in the state court proceeding." (Plaintiffs' opposition memorandum of law at 11).  However, in order to circumvent collateral estoppel, plaintiffs erroneously claim that they have uncovered "new information" that should permit them to proceed with their bad faith claim.  This argument fails for two reasons. First, the information is not new.  Second, even if it were, it does not support a claim of bad faith.

While citing to Scooper Dooper, Inc. v. Kraftco Corp., 494 F.2d 840 (3d Cir. 1974), plaintiffs argue that an exception to collateral estoppel exists when controlling facts have changed. (Plaintiffs' opposition memorandum of law at 11). However, Scooper Dooper is inapposite. In that case, the court merely recognized that the defense of collateral estoppel may not apply where "changed circumstances of controlling significance are present." 494 F.2d at 847. This exception to collateral estoppel does not apply where the party had a full opportunity to present countervailing evidence in the prior proceeding. Id. at 848. Furthermore, the changed circumstances must be material and implicate controlling facts that could not have been discovered through the exercise of due diligence. Dinicola v. DiPaulo, 945 F. Supp. 848, 863 (W.D. Pa. 1996).

In their opposition memorandum of law, plaintiffs erroneously claim that the "changed circumstances" relate to the existence of boiler and machinery coverage under the Hartford insurance policy. (Plaintiffs' opposition memorandum of law at 11-13). However, there is nothing new about that coverage, nor is there any evidence that Hartford concealed the coverage.

The complaint filed by TJS against Hartford in state court in December 1999 is attached to Hartford's motion for summary judgment as **Exhibit C**. Exhibit 1 to TJS' complaint was a copy of the Hartford insurance policy. Thus, at least by December, 1999, TJS and plaintiffs had a copy of their insurance policy. The insurance policy attached to TJS' complaint contains the boiler and machinery coverage part including the applicable forms. (See forms HM 00 60 02 95 and HM 99 06 04 91, also attached here as **Exhibit M**). In the complaint, TJS expressly avers that the Hartford policy contained the "systems breakdown coverage." (See TJS complaint, ¶17(f), attached to Hartford's motion for summary judgment as **Exhibit C**). Therefore, there is no credible evidence that the existence of the boiler and machinery coverage was not, or could not, have been presented as evidence in the TJS state court action, and plaintiffs claim that they "newly discovered" this coverage is specious.

In addition, plaintiffs erroneously claim that they were not aware of the boiler and machinery coverage until they deposed Hartford's adjuster, Alan Mycek, on October 9, 2002. However, Mr. Mycek was deposed in the state court action on April 11, 2001, and he advised plaintiffs' counsel that he had placed Hartford Steam Boiler and Inspection Company on notice of TJS' claim. (Deposition of Alan Mycek dated April 11, 2001 at 130, attached to plaintiffs' opposition memorandum of law as Exhibit 9). Mr. Mycek also told plaintiffs' counsel that he did not recall at that time how Hartford Steam Boiler and Inspection Company responded to the claim. (Id. at 131). Mr. Mycek's prior deposition testimony was not contradicted, in any way, by his more recent deposition in this case. In particular, Mr. Mycek testified that Hartford automatically informs Hartford Steam Boiler and Inspection Company of a claim when they reinsure Hartford's boiler and machinery coverage. (Deposition of Alan Mycek dated October 9, 2002, at 54, attached hereto as **Exhibit N**). Hartford Steam Boiler and Inspection Company then determines whether there is coverage under that portion of the policy. (Id. at 56-57).

Whether there was coverage under the boiler and machinery coverage is irrelevant since the claim was ultimately denied for insurance fraud. Moreover, the boiler and machinery coverage did not insure for loss of business income. (See boiler and machinery coverage part - Declarations, "Optional Coverage: ... Business Income (including Extra Expense) limit of insurance - 12 consecutive months", form HM 00 60 02 95). Business income loss coverage was an optional coverage that had not been purchased by plaintiffs.

Even assuming arguendo that the existence of the boiler and machinery coverage were "newly discovered", it does not constitute bad faith. In Pennsylvania, there is no common law remedy for bad faith on the part of an insurer, only a statutory remedy. See MGA Insurance Company v. Bakos, 699 A.2d 751, 752 (Pa. Super. 1997). Section 8371 of Title 42 provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>   (1)   Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>   (2)   Award punitive damages against the insurer.
>   (3)   Assess court costs and attorney fees against the insurer.

42 Pa.C.S. §8371.

"A recovery for bad faith requires clear and convincing evidence of bad faith, rather than mere insinuation...." Bakos, 699 A.2d at 754; Terletsky v. Prudential Property and Casualty Insurance Company, 437 Pa. Super. 108, 649 A.2d 680, 688 (1994). The "clear and convincing evidence standard" requires a showing by plaintiff that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant acted in bad faith. See Packel, Pennsylvania Evidence §303.2 (1987); Stafford v. Reed, 363 Pa. 405, 410-11, 70 A.2d 345, 348 (1950).

Section 8371 does not define "bad faith". However, the courts have attached a particular meaning to the term in the insurance context:

> Insurance. "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Terletsky, 649 A.2d at 688; quoting Black's Law Dictionary 139 (6th ed. 1990); see also Williams v. Nationwide Mutual Insurance Company, 750 A.2d 881, 887 (Pa. Super. 2000); Keefe v. Prudential Property & Casualty Insurance Company, 203 F.3d 218, 225 (3d Cir. 2000). In order to recover for a claim of bad faith, "the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim." Id. An insurer's conduct cannot

form the basis of a cause of action for bad faith without "evidence of dishonest purpose or evil motive." Jung v. Nationwide Mutual Fire Insurance Company, 949 F.Supp. 353, 361 (E.D. Pa. 1997), citing Terletsky, 649 A.2d at 688. Moreover, when there is no "definitive precedent" in this jurisdiction, bad faith cannot be found where the insurer's conduct is in accordance with a reasonable but incorrect interpretation of the insurance policy and the law. J.H. France Refractories Company v. Allstate Insurance Company, 534 Pa. 29, 626 A.2d 502, 510 (1993); Terletsky, 649 A.2d at 690; Jung, 949 F.Supp. at 360 n.7.

The claims of bad faith by plaintiffs regarding the boiler and machinery coverage is principally based upon a self-serving affidavit of plaintiff Sicalides. Even so, they do not rise to the level of bad faith under Pennsylvania law. Plaintiffs have not presented any evidence that Hartford did not have a good faith basis for denying plaintiffs' claim. To the contrary, the state court has already found that Hartford had a good faith basis for denying TJS' claim under all parts of the policy based upon insurance fraud. Therefore, collateral estoppel does apply, and Hartford is entitled to summary judgment.

Based upon the foregoing arguments and authorities as well as those set forth in its motion for summary judgment, defendant, Hartford Casualty Insurance Company, respectfully requests that this Honorable Court enter summary judgment in its favor and against plaintiffs.

    Respectfully submitted,

    DUFFY & KEENAN

By: _____
PATRICK J. KEENAN, ESQUIRE
Attorney for Defendant,
Hartford Casualty Insurance Company
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, Pa 19106
215.238.8700

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS J. SICALIDES<br>T&T TRANSPORTATION<br>MICHAELS, INC.<br>MILLENNIUM, INC.<br><br>vs.<br><br>HARTFORD CASUALTY INSURANCE COMPANY | CIVIL ACTION NO.<br>02-CV-2937 |

### CERTIFICATE OF SERVICE

I, Patrick J. Keenan, Esquire hereby certify that on November 13, 2002, I served a copy of Reply Memorandum of Law in Support o Defendant, Hartford Casualty Insurance Company's Motion for Summary Judgment by U.S. mail, to the following counsel:

>Robin Gray, Esquire
>P.O. Box 4322
>Reading, PA 19606

DUFFY & KEENAN

By: _____
PATRICK J. KEENAN, ESQUIRE
Attorney for Defendant,
Hartford Insurance Company
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, Pa 19106
215.238.8700